# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-348 RCL** |
| | ) | |
| **JOSEPH A. COVELLI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## JOSEPH COVELLI'S MEMORANDUM IN AID OF SENTENCING

Defendant, Joseph Covelli, by and through counsel, respectfully submits this memorandum in aid of sentencing. The sentencing hearing is scheduled for March 12, 2008.

## I. INTRODUCTION

On January 4, 2008, Joseph Covelli, age 22, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) entered a plea of guilty to one count of knowingly accessing a protected computer in excess of his authorized access with the requisite intent to defraud and obtain something of value in violation of 18 U.S.C. § 1030(a)(4). As part of the plea agreement, the Government agreed not to oppose a sentence of probation in this case. The parties agreed, pursuant to the Government's interpretation of the "loss" requirement in this case which focused on the potential loss to the victim, in this case Commerce Bank, that the Sentencing Guidelines calculation in this case was a level 8. The Probation Office, noting that the actual loss to the bank was zero, calculated Mr. Covelli's Sentencing Guideline exposure at a level 6. Both of those calculations place Mr. Covelli within Zone A of the Sentencing Table of the Sentencing Guidelines which permits the imposition of a probationary sentence. We submit that is the

appropriate disposition in this case.   We respectfully request that the Court sentence Mr. Covelli

to a term of probation without any term of confinement of any sort.   If the Court is disposed to

impose a term of confinement, we request that it be served as a term of home confinement with

work release privileges.

## II.  BACKGROUND

### A.      Nature of the Offense

Mr. Covelli pled guilty to an offense growing out of a weekend of gambling in Atlantic

City from February 4 to 6, 2007.  The offense was committed when he was 21-1/2 years old and

serving as a part-time assistant branch manager for Commerce Bank.   In essence, by virtue of his

position, Mr. Covelli arranged to make himself a temporary, unauthorized loan by increasing the

amount of available funds in his personal account that allowed him to withdraw $9,908 on

February 5, 2007 from an ATM in order to gamble.   Everything else he and his colleagues did

with the computer system was akin to a "paper" transaction.  With the wrongfully withdrawn

funds, he won enough money to cover the potential overdraft that would have shown up as a

result of his misuse of the bank's computer system and promptly deposited the funds in his

account so that the "fake" deposit was balanced and the bank lost no money as a result of the

offense.   When confronted by the FBI agents who went to his dorm room at GW, Mr. Covelli

readily admitted that he was exceeded his authorized access to the bank's protected computer

system with the assistance of his bank colleagues and accepted responsibility for what he had

done.  While he intended to mislead his superiors by putting back the money he wrongfully

withdrew before they found out about it, it was, as Mr. Covelli readily admitted to me, a

REALLY STUPID thing to do.  At a very young age, Mr. Covelli had been entrusted with a

2

management position at the bank while working there to help pay his way through college and graduate school in accounting at George Washington University.   He was looking forward to a responsible and successful career.   He realizes that he has forever damaged his record, his reputation, and his career by this horrendous mistake and lapse in judgment.

Mr. Covelli graduated from GW with a bachelor's degree in accounting in 2006.   He completed a masters program in accounting except for one credit and he expects to complete that degree in May 2008.   He has detailed in his letter his background of growing up in a middle class Long Island family with parents who sacrificed greatly to assure that their sons would go to college.  Neither of Mr. Covelli's parents graduated from college.   Mr. Covelli now lives with his parents in the neighborhood where he was raised.   He lives near the grandfather he adores and who, without hesitation, took out a home equity loan against the residence he lives in that had been paid off and loaned Mr. Covelli money in order to pay debts he incurred while gambling.   Mr. Covelli took up gambling after he turned 21 and, perhaps as a result of his youth and inexperience, quickly amassed significant debts from it.   He must pay $821 per month on that debt in order to repay the grandfather's loan.

Mr. Covelli was never irresponsible with money before he took up gambling.   As a high school and college student, he worked at a variety of jobs.   After working at a local Temple, Mr. Covelli worked as a cashier and stock clerk for a beer distributor in his home town.    He then went to work as a cashier at a local grocery store, King Kullen, and did such fine work that he was promoted to a job handling customer service issues.   After a job with a department store, Mr. Covelli began what he anticipated would be his career at Commerce Bank in May 2003, just before he graduated from high school with a 97.9 grade point average and 14th in his class of 302

3

students.    He spent the summer prior to his college entrance as a customer service representative at the bank.

Thanks to his hard work in high school and his desire to save money on tuition, Mr. Covelli entered college with a number of Advanced Placement credits and immediately embarked upon a rigorous course of study in accounting and political science.    During the fall of his sophomore year, he joined a fraternity, Pi Kappa Alpha, and came under the guidance of Steven Broderick, an alumni advisor to the fraternity.    Mr. Covelli assumed the responsibilities of House Manager and was elected by the other fraternity brothers to the post of treasurer which is an honor.    Mr. Broderick has written to you about how well and creatively Mr. Covelli handled his responsibilities as treasurer.    Mr. Broderick was very impressed with Mr. Covelli's financial savvy as well as his excellent handling of the funds.    Mr. Covelli served as treasurer from January of his junior year until the following January of his senior year.

Meanwhile, Mr. Covelli continued to work for Commerce Bank seasonally over the summers and during winter breaks while he was in school.    In the summer of 2004, he was hired as a weekend supervisor and helped prepare the first branch for opening in the DC area.    He worked throughout the school year of 2005 to 2006 as the weekend supervisor of the bank's Dupont Circle branch.    He graduated in 2006 after only three years at GW.

During his last two years at school, Mr. Covelli, who had been raised as a Catholic, worked as a volunteer for a local Catholic priest who was a client of the bank in addition to his studies and work for the bank.    Mr. Covelli did office work for about 26 hours per month on average, reports Father Sereno.    I have attached Father Sereno's letter to the Court which describes Mr. Covelli as "responsible, smart, willing, capable and reliable."    Father Sereno has

4

been very supportive of Mr. Covelli whom he thinks well of and regards his involvement in criminal conduct as a most regrettable youthful indiscretion.   Father Sereno has the advantage of his own volunteer work with DC prisoners as a backdrop for his counseling of Mr. Covelli. Thus, we hope that the Court will view Father Sereno's opinion as significant evidence of Mr. Covelli's capability for rehabilitation.

Mr. Broderick, who is 32 years old at this time, has written thoughtfully of the pressures he saw impacting on Mr. Covelli while he was in college and beyond.   He, too, regards this offense as one that a young, impulsive, immature man committed and not reflective of who Mr. Covelli is today.   Mr. Broderick, who has worked on Capitol Hill for 8 years and has managed a large budget, says that he would not hesitate to hire Mr. Covelli to manage money and sees no possibility that Mr. Covelli would make such a stupid mistake again.

## III.  SENTENCING ISSUES

### A.  THE PLEA AGREEMENT

We wish to express our appreciation to the prosecutor in this case, AUSA Geoffrey Carter, and to the FBI agents who investigated this matter, and to Mr. John Daly, the security officer at Commerce Bank who formerly served in the Check and Fraud squad at the Metropolitan Police Department.   The prosecutor and investigators demonstrated sensitivity to the fact that this defendant had committed this offense as a youth and, while deserving of condemnation and punishment, worked during the period of plea negotiations to achieve an appropriate result consistent with their responsibilities.

Mr. Covelli entered a plea of guilty to a computer crime under Federal Rule of Civil Procedure 11(c)(1) that provides that the government may agree that a specific sentence or

disposition is appropriate in the case.   In this instance, the Government agreed, as part of the

plea agreement, not to oppose a probationary sentence and we urge the Court to impose a

sentence of probation with such conditions as the Court deems appropriate.   We are hopeful that

the Court will agree that no period of confinement is necessary in this case in light of the

considerations to be taken into account under 18 U.S.C. § 3553.

B.  FACTORS TO BE CONSIDERED IN SENTENCING

The Court is required to consider (1) the nature and circumstances of the offense and the

history and characteristics of the defendant; (2) the need for the sentence imposed to reflect – (A)

to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect

the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational and vocational training, medical care or other correctional treatment in the most

effective manner; (4) the kinds of sentences and sentencing range available; (5) any pertinent

policy statement issued by the US Sentencing Commission; (6) the need to avoid unwarranted

sentencing disparities among defendants with similar records who have been found guilty of

similar conduct; and (7) the need to provide restitution to any victims of the offense.   The goal is

to determine a sentence that is "sufficient, but not greater than necessary."

In *United States v. Booker,* 543 U.S. 220; 245, 125 S. Ct. 738; 160 L. Ed. 2d 621 (2005),

the Supreme Court rendered the  federal Sentencing Guidelines advisory but reserved a key role

for the US Sentencing Commission: in the ordinary case, the Sentencing Guidelines may be

regarded as the Sentencing Commission's recommendation of a sentencing range that "reflect a

rough approximation of sentences that will achieve the § 3553(a) objectives."  *Kimbrough v.*

*United States,* ___ U.S. ___, 128 S. Ct. 558; 169 L. Ed. 2d 481 (2007), quoting *Rita v. United States,* 551 U.S. ___, 127 S. Ct. 2456; 168 L. Ed. 2d 203, 213 (2007).   In light of the confidence reposed in the judgment of the district courts, a sentence is reviewed only for an abuse of discretion. *See, Kimbrough v. United States,* 169 L.Ed.2d at 494 - 495, 501.  The sentence must be defensible as "reasonable" but the district court is viewed as being in the best position to evaluate the facts and circumstances of the case and a particular defendant's characteristics. *Id.*

### C.   NO OCCUPATIONAL RESTRICTION IS NECESSARY OR APPROPRIATE

The pre-sentence report of the Probation Officer raises the issue for the Court of whether an occupational restriction in the form of notification of Mr. Covelli's employer would be appropriate in this case under § 5F1.5 of the Sentencing Guidelines.  One of the standard conditions of supervised release is:

> "[A]s directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement."

It is in light of the standards and facts discussed below,  we urge the Court to reject any requirement that Mr. Covelli be directed to notify his current employer of his conviction and direct the probation office not to notify any third parties of the conviction or defendant's criminal history or any information concerning the offense without prior notification to the defendant and the Court and an opportunity for a hearing.   Such a notification requirement as unsupported by the evidence.   Because of the risk of inadvertent but well-intended disclosure by a probation officer, we think it important that the Court affirmatively state as a condition of the defendant's probation that the Probation Officers refrain from disclosing defendant's criminal conviction to

his current or prospective employers without the explicit permission of the Court.   The reason

for this request is to permit the Court to be the one that evaluates, in each instance, the actual risk

posed by the defendant (which, we submit, is minimal) under the circumstances of a particular

job.

      The power to impose conditions of supervised release is vested in the district court alone,

not in the Probation Office.   18 U.S.C. § 3583(d).   The Court has the power to modify those

conditions as well.   18 U.S.C. § 3583(e).   The district court delegates the duty to enforce the

terms and conditions of supervised release as determined by the court.   *United States v. Cutler,*

2008 US APP LEXIS 1086 (7th Cir. January 17, 2008), citing *United States v. Rearden,* 349 F.3d

608, 619-20 (9th Cir. 2003).   Accordingly, probation officers may exercise discretion, but may not

exercise discretion "inconsistent with the conditions specified by the court."   18 U.S.C. §

3606(3).   Along those lines, a probation officer lacks the authority to impose an occupational

restriction as a condition of supervised release; only a court may do so.   *United States v.

Dempsey,* 180 F.3d 1325, 1326 (11th Cir. 1999).

      § 5F1.5 of the Sentencing Guidelines advises that a district court may impose

occupational restrictions *only* when the district court specifically finds (1) a "reasonably direct

relationship" between the occupational restriction and the conduct relevant to the defendant's

offense; and (2) the restriction is "reasonably necessary to protect the public" from the possibility

that the defendant will "continue to engage in unlawful conduct similar to that for which he was

convicted."   Congress, mindful of the damaging effect that the revelation of a criminal

conviction may have on a defendant's employment prospects, chose to reside such discretion

only in the sentencing court, rather than the probation officer.   The Senate Judiciary

Committee's Report on the Comprehensive Crime Control Act explained that § 3583(d) was intended to be used to preclude the continuation or repetition of illegal activities while avoiding a bar from employment that exceeds that necessary to achieve the result." S. Rep. 225, 98th Cong., 1st Sess., pp. 96-97, cited in the commentary to § 5F1.5 of the Sentencing Guidelines (2007 ed.). The Guidelines counsel that the use of occupational restrictions should be for the minimum time and to the minimum extent necessary to protect the public. § 5F1.5(b).

A requirement that a defendant's employer be notified of his conviction is an "occupational restriction" pursuant to USSG § 5F1.5. *United States v. Souser,*         (10th Cir. 2005). This is because the notification requirement limits the terms on which a defendant may engage in the specified occupation. *See United States v. Peterson,* 248 F.3d 79, 85-86 (2d Cir. 2001). Similarly, requiring a defendant to report his conviction to his clients is an occupational restriction under 5F1.5. *United States v. Britt,* 332 F. 3d 1229, 1232 (9th Cir. 2003). Thus, if the Court were disposed to order such a condition of probation, the Court would be well advised to make findings of fact that:    (1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and

(2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct.

The danger inherent in the imposition of such an occupational restriction such as requiring a defendant or a probation officer to provide notice of the defendant's criminal history to his employer was illustrated in the recent case of *Fuller-Avent v. U.S. Probation Office,* 226 Fed. Ax. 1, 2006 U.S. APP LEXIS 29614 (D.C. Cir. 2006). In that case, the probationer, a disbarred attorney, was promptly fired by her employer, Lockheed Martin, when the probation

9

officer, without notifying her, sent a fax of her criminal history to her supervisor.   The case stands for the proposition that the defendant has no right to a remedy for such damage under the Privacy Act or the Federal Tort Claims Act or the 5th Amendment, but it does illustrate the peril that employed probationers are in if their employers become inappropriately aware of their criminal history.

We submit that there are insufficient facts and circumstances in the case of Mr. Covelli that would support the imposition of a notification requirement as an occupational restriction under §5F1.5.

Mr. Covelli's occupation, business, or profession is in the field of accountancy.   He lives and works in New York State.   §7401 of Article 149 of the Education Law of New York defines public accountancy as follows:

### § 7401. Definition of practice of public accountancy.

> The practice of the profession of public accountancy is defined as holding one`s self out to the public, in consideration of compensation received or to be received, offering to perform or performing for other persons, services which involve signing, delivering or issuing or causing to be signed, delivered or issued any financial, accounting or related statement or any opinion on, report on, or certificate to such statement if, by reason of the signature, or the stationery or wording employed, or otherwise, it is indicated or implied that the practitioner has acted or is acting, in relation to said financial, accounting or related statement, or reporting as an independent accountant or auditor or as an individual having or purporting to have expert knowledge in accounting or auditing.

In order to be licensed as a certified public accountant or public accountant in New York State where Mr. Covelli lives and works, an applicant must, in addition to meeting the educational requirements,  present "evidence, satisfactory to the State Board for Public Accountancy, of

diversified experience involving the application of generally accepted accounting principles and

the application of generally accepted auditing standards in the practice of public accountancy

either as a result of employment therein" or its equivalent.  New York State Education

Department, Office of the Professions, Regulations of the Commissioner, § 70.2(a).   The

experience must be at least one year and possibly two years of experience and must be under the

supervision of a certified public accountant licensed in New York State in order to be a CPA.  To

become a "public accountant" without completing the examination, more years of experience are

required.  An applicant must also pass an examination and meet continuing education

requirements.  Finally, the applicant must be of "good moral character" as determined by the

department.  *See §§* 7404 and 7405 of Article 149 of the New York Education Law (Public

Accountancy) at  www.op.nysed.gov/article149.htm.   The Board of Regents in New York State

also enforces rules against unprofessional conduct in accountancy that require, among other

things, a report to be made to the Board of Regents of such unprofessional conduct of a licensee.

*See,* Rules of the Board of Regents, Part 29, Unprofessional Conduct. § 29.10 (Special

Provisions for the Profession of Public Accountancy) at www.op.nysed.gov/part29.htm#cpa.

None of the standards listed appear to be directly related to the conduct at issue in this case

(unauthorized access to a computer for the purpose of defrauding its owner).

  At the present time, Mr. Covelli is employed as a junior auditor by one of the "Big Four"

accounting firms.   His job is essentially that of a "bean counter."  His role is as one of  the most

junior member of a team.  The audit function is described by KPMG on its website as:  "An

independent audit of financial statements is one of the foundations for the effective operation of

the capital markets. Audit quality is vital for maintaining trust in the financial reporting process

and the integrity of financial information. Audit teams equipped with a high level of technical

skills and empowered with professional skepticism provide the heart and soul of a good audit."

Thus, an auditor does not work with client funds or have the ability to manipulate client or firm

computer systems for personal gain.

Mr. Covelli's description of his job duties, which is taken from the attached letter to the

Court from Mr. Covelli says:

> As an auditor, I have no responsibility for a client's funds or computer systems.  The firm
> also provides its employees with corporate cards used only for firm related expenses such
> as lodging or meals, which require receipts and expense report for reimbursement. There
> is no access to firm funds or advances of any sort.  In my new role, my duties are limited
> to examining the client's books and records and providing information to my supervisors
> from which they determine whether the client has met the auditing standards.   The
> auditor goals given to me by KPMG require me to understand and comply with all
> applicable firm professional practice and risk management principles and policies.    I
> have to complete firm training programs that include training on auditing standards and
> ethics.    I am also required to do independent reading and self-study to enhance my
> knowledge of accounting practice.    I undergo regular performance management review
> by my supervisor, including goal setting and reviews of the engagement that I am
> working on.    I have been assigned to an engagement at Citibank, which effectively uses
> my knowledge of bank practices and controls.    As a junior auditor I have very little
> discretion and am expected to take responsibility only for effectively managing my client
> assignments as well as my progress at the firm.

A review of the KPMG Goals Statement for Audit Associates for fiscal year 2008 which is

attached as part of the exhibits shows that a junior auditor such as Mr. Covelli works with a team

and is under the direction and reports to a senior associate to whom he may turn for guidance as

well as assignments.    His job goals are aimed at providing a high level of client service while

developing his educational and knowledge level within the firm.

Therefore, we submit that the Court may conclude that there is no "reasonably direct

relationship" between Mr. Covelli's conduct that formed the basis for the instant offense

(manipulating a bank's computer system that was under his control to provide unauthorized credits to his personal account) and the work he is called upon to perform in his business, occupation, or profession as contemplated by § 5F1.5 of the Sentencing Guidelines.

The evidence does not support a conclusion that imposition of an occupational restriction such as a requirement of notification of Mr. Covelli's employer would be "reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct." A review of Mr. Covelli's family background, life experience, educational achievements, volunteer experience as the elected treasurer of his fraternity, and volunteer experience in the office of a local Catholic priest in the District of Columbia demonstrates that the conduct that brought him before the Court was aberrant behavior possibly produced by a youthful fascination with gambling. As Mr. Covelli states in his letter, he realized that gambling was creating significant problems for him and he quit "cold turkey." The letter submitted by Steven Broderick, press secretary to Senator Jay Rockefeller and a volunteer alumni advisor to Mr. Covelli's undergraduate fraternity, talks about Mr. Covelli's experience as the elected treasurer of his fraternity:

> During his junior year, Joe was elected by the membership as the treasurer of the fraternity. This was an honor for him and, for the first time, the fraternity had a treasurer who had some financial savvy. For a young man, this was a significant responsibility. The fraternity had an annual budget of about $30,000 to $35,000. Joe was responsible for collecting dues and keeping the fraternity's accounts in order. He would collect the dues in cash, checks or from online payments and make deposits to the fraternity's account at Commerce Bank. He was responsible for paying the bills. He had to keep the accounts straight and reimburse members who had spent money for fraternity projects. He achieved about a 90% collection rate which was an unbelievably good result. He also managed to grow the fraternity's money using his financial sense by doing such things as purchasing certificates of deposit in order to increase the interest paid on the fraternity's deposits and avoid the necessity of raising the dues. The fraternity's alumni audited the accounts of the fraternity annually to keep some measure of control.

13

Mr. Broderick is one of few friends in whom Mr. Covelli has confided and who is fully aware of

the circumstances that bring him before the Court for sentencing.   He has provided his opinion

that the criminal activity was the action of someone who was

> Joe was young and made a really stupid mistake that, had he been a few years older with
> more experience under his belt, he would never have done.  Since this incident happened,
> I have watched Joe go from being a happy go lucky college student to a grown up.  He is
> not as judgmental about other people; he no longer sees situations as black and white.
> He has had the fear of God put in him.  He understands that it is not enough to know right
> from wrong but also why he has to avoid doing something that is wrong.

Knowing of Mr. Covelli's misconduct, however, Mr. Broderick still resides great trust in Mr.

Covelli:

> Indeed, if I had a chance, I would hire him in a heartbeat.  In my previous positions, I
> have managed a budget of over $1 million.   Joe Covelli is one of the smartest guys I
> know when it comes to money.   He knows how to protect, audit and grow money.  He
> can make $1 grow into $10.   Joe even signed up his younger brother for a credit card
> account so that he would be able to get credit later on by demonstrating that he could
> handle it responsibly.   I do not know of anyone who would have thought so creatively
> about such things.   He told his brother it would be useful in case something happened to
> their mother and father.   I would not worry about Joe Covelli misspending anyone's
> money.   If he did (which he would not), he would pay it back immediately.   I believe
> him to be forthright and honest.  I think it was significant that he never ducked or evaded
> responsibility or tried to mislead anybody about what he did.  I think his forthrightness is
> representative of his character and that someone who was older would have known better.

The Most Reverend Michael P. Seneco, rector of Our Lady of Mt. Carmel Old Catholic Church

on Capitol Hill got to know Mr. Covelli when Mr. Covelli did volunteer work in his office for an

average of 26 hours a month during his junior and senior years of college.   Ironically, Father

Seneco serves as a chaplain for the DC Department of Corrections as part of his ministry.   Father

Seneco states:

> During the time he volunteered for me, I came to know Joe to be a man who is
> responsible, smart, willing, capable and reliable.  Despite his unfortunate lapse of conduct
> that violated the law, I would welcome him back to DC and to the work we do without

14

hesitation.

Father Seneco is also of the view that Mr. Covelli's lapse into illegal activity is "out of character for him and will not be repeated." He said that based on his knowledge of Mr. Covelli that it was the kind of "error in judgment that someone who has not yet matured might commit. . . ."[1]

Mr. Covelli continues to live with his parents in the house where he grew up. Due to his financial circumstances, it is likely that he will continue to live there until he can pay off his debts.

So, for all these reasons, we ask the Court not to impose an occupational restriction that includes a requirement that the defendant or the probation officer report the defendant's criminal history or conviction in this case or any information about it to defendant's employer(s) without an order from this Court after a hearing. The opinion in that case reported that the United States Probation Manual that guides the performance of duties of a United States probation officer has a provision under which a probation officer "has a duty to warn specific third parties of a particular prospect of harm . . . which the officer 'reasonably foresees' the offender may pose to them." GUIDE TO JUDICIARY POLICIES AND PROCEDURES, vol. X (U.S. Probation

---

[1]     Indeed, neuroscience now teaches that the adolescent brain is still undergoing rapid change and does not reach adult capacity until the early twenties. The International Justice Project, "Brain Development, Culpability and the Death Penalty," at www.internationaljusticeproject.org/pdfs/juvBrainDev.pdf. The discovery of this change in the adolescent brain is regarded as one of the important discoveries in neuro-biology of the 1990's. Neuro Scientist Jay Giedd of the National Institute of Mental Health and Paul Thompson, a neurologist at the University of California found that significant changes occur in the frontal lobes of the brain and specifically in the prefrontal cortex which controls impulses, calms emotions, and provides an understanding of the consequences of behavior. These scientists concluded that the "executive functions" of reasoned, logical, rational decision making processes do not fully develop until the early twenties. Giedd, http://www.pbs.org/wgbh/pages/frontline/shows/teenbrain.

Manual), ch. IV, at 36, part D.3 (1992) (emphasis omitted) [hereinafter *Manual*]. Harm is assessed based on a number of factors, including "the offender's employment, offense, prior criminal background, and conduct" and any particular "opportunity or temptation" for recidivism. *Id.* at 36-37, part D.3.D(1). While part D.3.D(3)(e) of the Manual states that if an offender "strongly opposes" the disclosure of information to his or her employer, the matter should be presented to the court, *id.* at 38, such a procedure would not necessarily protect a defendant such as Mr. Covelli from unwarranted disclosure of his criminal conviction unrelated to the substance of his employment.   Accordingly we ask that the Court affirmatively prohibit such disclosure as part of its Judgment and Commitment and description of the conditions of probation that it imposes upon Mr. Covelli.

We note that Mr. Covelli, as the Government acknowledges, fully accepted responsibility for his conduct at an early stage of the investigation of this case, immediately paid back the money so that Commerce Bank suffered no monetary loss from his conduct other than the costs associated with its own internal investigation, and has exhibited appropriate remorse.

In summary, we believe that all of the facts and circumstances, including the Government's lack of opposition thereto, support a probationary sentence.   Mr. Covelli's personal history and characteristics support a probationary sentence that includes the standard conditions of probation but not home detention, restrictions on his movement or confinement of any sort.   Mr. Covelli's family is actively involved in his life and could not be more supportive (albeit disappointed in his conduct).    A probationary sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment and afford adequate deterrence to others.   Mr. Covelli will leave this court as a convicted felon and will carry that negative

16

consequence for the rest of his life.   Not only will he be stigmatized but he will suffer the loss of

rights that go along with a felony conviction.   Because of thiis offense Mr. Covelli has suffered

shame and humiliation before his family and friends and lost his job at Commerce Bank.   He is

concerned about the possibility of never being able to practice the profession that he studied so

hard to prepare for.   The evidence from Mr. Broderick, Father Sereno and Mr. Covelli himself

suggests that there is no likelihood of recidivism in this case.

     D.    <u>COMPARABLE SENTENCES</u>

The statistics for sentencing in the federal courts do not separately break out computer

crimes as a category of "fraud."   However, in response to a directive from Congress, the US

Sentencing Commission did prepare a report in 1996 on sentences for computer fraud.   The

Congress wanted the Commission to review the deterrent effect of the then-existing Guideline

levels as they applied to offenses committed in violation of 18 U.S.C. § 1030(a)(4) and (a)(5).

Report to the Congress, "Adequacy of Federal Sentencing Guideline Penalties for Computer

Fraud and Vandalism Offenses (as directed by section 805 of Public Law 104-132)," United

States Sentencing Commission, June 1996 (hereinafter "Report").   According to the Report, the

Commission reviewed approximately 80 per cent of the Guideline convictions for those offenses

from 1988 to 1996.  Report at p. 2.   The Commission found that such cases are relatively

uncommon.   *Id.*  In the nine years since the Guidelines had become effective, only sixty cases of

computer crimes were found to have been successfully prosecuted and studied.  *Id.*   The

Commission found that courts sentenced a higher percentage of defendants convicted of

computer crimes within the Guideline range than other white collar criminal defendants.  *Id.*  As

of the date of the Report, no person convicted of violating 18 U.S.C. § 1030(a)(4) or (a)(5) and

17

sentenced under the Guidelines had been sentenced for a subsequent federal crime. Report at p. 3, 6, and 8. Only 51 of the 136 convictions for violations of 18 U.S.C. § 1030 fell under (a)(4) or (a)(5). Report at p. 5. Only 40 of the 51 cases involved those subsections of the statute as the primary offense of conviction. Of those 40 cases, 21 were sentenced to some term of imprisonment and 19 received probationary sentences. Report at p. 6. None were subject to upward departures. Report at p. 2. The data tends to suggest that sentencing judges are generally satisfied that guideline sentences for computer crime defendants are realistically constructed to mirror the seriousness o f these offenses. Report at p. 7. The data also suggests that a probationary sentence for Mr. Covelli would be comparable to offenders convicted of this type of offense and would be "reasonable."

E.    ANY FINE SHOULD BE MODEST

Finally, we note that the statute and Sentencing Guidelines permit the Court to impose a fine in this case. Mr. Covelli is already living beyond his means even though he is living with his parents because of his obligation to pay back the loan that his grandfather made him to cover his gambling debts. Mr. Covelli has educational debts and debts to his family to reimburse them for his legal fees. Thus, we ask that any monetary punishment imposed by the Court be as modest as possible.

**IV. CONCLUSION**

For the reasons stated above, defendant Joseph Covelli respectfully requests that the Court accept his plea agreement and sentence him to a term of probation without any period of confinement and, other than the mandatory assessment, if the Court feels that a fine is required, that it be modest in light of Mr. Covelli's financial obligations to his family.

Respectfully submitted,

/s/ Pamela B. Stuart

_____
Pamela B. Stuart #220-236
The J. Raymond Stuart Building
1750 N Street, N.W.
Washington, D.C.  20036
202-835-2200
202-835-2202 fax
pamstuart@aol.com
202-255-1680 cell
202-244-0723 home office
202-966-1908 home fax

*Attorney for Joseph A. Covelli*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Joseph Covelli's Memorandum in Aid of Sentencing and exhibits thereto were served electronically by the court's ECF system upon Geoffrey Carter, Esq., Assistant United States Attorney and by email to AUSA Carter and United States Probation Officer Michael Penders this 5th day of March, 2008..

/s/  Pamela B. Stuart

_____
Pamela B. Stuart

EXHIBIT A



**KPMG LLP**
345 Park Avenue
New York, NY 10154

Telephone  212 758 9700
Fax        212 758 9819
Internet    www.us.kpmg.com

Attn: Pamela Smart

From: Joseph A Corell    fax (212.898.0472)

Ref. Letter

Pages: (6) w/ cover

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

March 4, 2008

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
3rd & Constitution Avenue, NW
Washington, DC 20001

   Re: Case number 07-348

Dear Judge Lamberth:

   I am writing you to try to put into words how awful I feel about what brings me to your court and how I intend to do everything I can to repair my life and reputation if you decide to sentence me to probation. I assure you that your trust will not be misplaced. You will never see me in this or any other court as a criminal defendant again.

   Let me introduce myself to you by filling in the background that the description of the offense I did leaves out. I was born September 21, 1985, in Long Island, NY. My two parents are Michelle and Arthur Covelli. Both had come from hard-working middle class families who moved to Long Island in the 1960s, from Queens, New York. My father works in construction for a general contractor in Manhattan, while my mother works for a home health care agency in the billing department on Long Island. In his youth, my father went to New York Institute of Technology for two years, however, did not complete his degree, and my mother worked straight out of high school as well.

   By 1991, we had moved from Suffolk County to my house in Bellmore, where I began elementary school at Jacob Gunther School, just a few blocks from home, and eventually proceeded on to Grand Avenue Middle School, and ultimately W.C. Mepham High School.

   Growing up in North Bellmore, I learned at an early age that it was very important to maintain a work/life balance relationship, and thus I had my first job by age 14, working the Coat Room for Bar and Bat Mitzvahs at a local temple, Temple Beth El. After doing this for a short time, I had my first steady job working as a Cashier and stock clerk at a local beer distributor, called the Beverage Baron, on Fridays, Saturdays and Sundays, just up the street from my house. As the business neared its end, I began working for King Kullen Grocery Stores, a local supermarket chain in the New York area. In a short time, I was promoted from Cashier to work in the Office/Customer Service area, supervising cashiers and counting down drawers, while also servicing customer complaints and issues. After my time at King Kullen, I left to work at Century 21 Department Stores, before ultimately working for Commerce Bank in May of 2003.

   While steadily working at different places throughout high school, I managed to also maintain a 97.9 GPA, and graduate 14th in my class out of 302 students in June 2003. While in Mepham High School, I participated in various activities including Political Forum, SADD (Students Against Drunk Driving), FBLA (Future Business Leaders of America), and achieved

membership in several honor societies including the National Science Honor Society, La Sociedad Honoraria Hispanica, (Spanish Honor Society) and the National Honor Society. Having earned leadership positions in FBLA and Spanish Honor Society as Vice President, I learned to be creative in my time management.

After graduating high school, I worked at Commerce Bank for the entire summer of 2003, as a customer service representative, opening accounts, taking care of customers, etc. By August 2003, I was set to go off to college at The George Washington University in Washington, DC, where I had a jump-start with my AP Credits, putting me at almost a sophomore as far as credits go before I even began classes. Undertaking such an expensive university was a very important decision to make – and was not one which my family took lightly. Funded by savings, loans taken out by my parents and myself, and through my working while in school, I was afforded the opportunity to attend GW. I also won two separate scholarships from my father's union, which helped supplement college costs, yet it was truly the ability to graduate in three years that saved me a lot of money, and took a lot of extra hard work to do so. Due to the fact that neither of my parents was afforded the opportunity to attend college, let alone such an expensive college, an emphasis was placed heavily on my schoolwork to do well, but to also learn how to manage my time between work, play, and studying.

Declaring my major in accounting with a political science minor, I was put into rigorous classes for a freshman. Adjusting to college life, I decided to pledge my Fraternity, Pi Kappa Alpha, with three of my closest friends at college in Fall 2004. After making this decision, my grandmother passed away unexpectedly, which took a toll on my younger brother and me. Being far away from home at such a difficult time, taught me a hard lesson about what life can sometimes bring to you. My grandfather had been left alone, and living only one town away, it would be very difficult to not be able to take care of him everyday and see to it that he was okay. Despite the unexpected, my family was able to pull together and get through the situation, and I went back and forth to New York very often, and I maintain this close relationship with my grandfather and the rest of my family to this day.

Eventually getting back into the swing of things as much as possible, I was eventually able to assume various positions of responsibility with my Fraternity after pledging, including House Manager, where I setup plans for the Fraternity to work towards getting its own property and house, and ultimately Treasurer, an Executive Board position. In this position, a large degree of trust is put into the hands of the elected officer. As treasurer, you have a degree of autonomy in what to do with chapter funds, where to invest them, and ultimately can affect the prosperity and future of the chapter. In my role as treasurer, despite certain brothers leaving the chapter and not paying dues, collection rates were kept above 90%, with many planned events thrown by the Chapter going on as planned. In addition, questions were raised regarding "transactions" on fraternity accounts utilizing a debit card in my name, however, I was able to prove those transactions which were unauthorized to not have been done by myself or any other account signatory and thus all monies were refunded to the Fraternity through the bank Regulation E process. Through my participation and discretion, our fraternity was able to further invest funds, and also contribute to many community service projects on campus, including S.T.A.N.D. (Students Taking Action Now: Darfur), and various other campus groups.

Having gone back to New York after my first year of college, I wanted to stay in DC for the summer following my sophomore year; however, I needed to find a way to pay for the dorm room if I was going to stay. An opportunity presented itself to work for Commerce Bank in the DC area, since I had worked for them seasonally over the summer and winter breaks since I started in 2003. Hired as weekend supervisor, I worked all summer preparing the branch, as it was the first store in the DC market. Once the store opened in June 2005, I continued to work around my school schedule as the Weekend supervisor of the Dupont Circle branch, eventually graduating in June 2006, with my Bachelors of Accountancy, one full year early. Around this time, I was also admitted to the Masters of Accountancy program for admission in September 2006. This was a one-year program to supplement my Bachelors and prepare me for a career post college.

Having always thought I would work for Commerce Bank, and in retail banking, an opportunity presented itself in February of 2007 to interview with KPMG, one of the big four accounting firms. After a preview to the position and several interviews in New York and Washington, DC, a spot was made for me in the New York Financial Services Audit practice, where I now work as an Audit associate on the Citigroup Audit engagement.

It is my hope that I can somehow put this unfortunate decision and the events that followed from it behind me. I feel as though I managed to throw away all of the hard work and good things I had done in my life in one colossal, impulsive and stupid mistake. What I did that caused me to have the FBI agents come to my dorm room and recommend prosecuting me is not in any way representative of my character. I am an honest person and I immediately confessed to them when they questioned me. I have no problem in taking responsibility for my conduct – I am just going to have to live with the repercussions from it for the rest of my life. Obviously I will have to report this conviction whenever asked if I have been convicted of a crime – including to the New York State accountancy board if I am fortunate enough to pass the exam. I am very afraid that if my employer, KPMG, finds out about this situation that I will be fired – not because anything I do in my job jeopardizes the firm or any clients – but just on principle.

As you may know, beginning in 2005, KPMG was prosecuted in New York on criminal tax fraud charges based upon some illegal tax shelters. The Justice Department charged that the firm's conduct generated billions of dollars in phony tax losses. As a result, the KPMG code of conduct is very strict and KPMG employees are provided with multiple channels of communication so that advice on ethics and performance is always available from, for example, my performance manager, my office-managing partner, the human resources department, the audit practice, and the risk management partners. There also is an ethics and compliance hotline.

As an auditor, I have no responsibility for a client's funds or computer systems. The firm also provides its employees with corporate cards used only for firm related expenses such as lodging or meals, which require receipts and expense report for reimbursement. There is no access to firm funds or advances of any sort. In my new role, my duties are limited to examining the client's books and records and providing information to my supervisors from which they determine whether the client has met the auditing standards. The auditor goals given to me by KPMG require me to understand and comply with all applicable firm professional practice and

risk management principles and policies.     I have to complete firm training programs that include training on auditing standards and ethics.     I am also required to do independent reading and self-study to enhance my knowledge of accounting practice.   I undergo regular performance management review by my supervisor, including goal setting and reviews of the engagement that I am working on.   **It is imperative to follow the KPMG Code of Conduct, in addition to performing and interacting well with others to maintain employment and constant assignment to clients within the Firm.** I have been assigned to an engagement at Citibank, which effectively uses my knowledge of bank practices and controls.   As a junior auditor I have very little discretion and am expected to take responsibility only for effectively managing my client assignments as well as my progress at the firm.

I know that I have learned a big lesson from my mistake at Commerce Bank that will help me be a better auditor.  I hope it does not cause me to jeopardize my future with KPMG, as I have worked very hard, and so have the people who have supported me in my family all this time. I count my success not only due to the work I have done myself, but to the people who have all pushed me forward to do better for myself than they ever could have had for themselves. In the event that I do lose my job because of this, I expect to pursue further education at some point because I may never be able to work in this field again.

You should know that while I am taking responsibility fully for what I did that I never intended that the bank should lose any money from my actions.   There is no question that my actions were designed so that my supervisors and bank officers would not discover that any funds were missing and so I did intend to mislead them.  I understand that I had a position at the bank in which I was invested with a great amount of responsibility and that I abused that trust in a way that, if I had it to do over again, I never would have done.  Working for the bank for such an extended period of time, there was a deep connection that I had built, with colleagues from Long Island down to the DC area. Relationships I had developed were very important to me, and I did my best to keep these connections open and grow business for the bank. And despite my new career path, a large part of me did and still feels a great sense of pride in Commerce Bank, as I was a part of its tremendous growth over the past four years. With my actions, I put my career along with the careers of my employees at risk and for that I am deeply sorry.   My actions were unbelievably stupid, had great risk, and were and still are completely out of character for anything I have ever done before.

I now understand what it means to be responsible for my own conduct in ways I never imagined.  I never would have predicted that I would do something so stupid as to commit a serious criminal offense.  It was bad enough that I was caught speeding and lost my driving privileges in Virginia and then, when I made a mistake and drove to pick up a friend who wanted a ride, I was found to be driving under the influence because I had some beer before taking off. I have tried to keep my situation confidential except for my family, the court, the probation officers, and a few trusted friends because I find my conduct reprehensible and shameful and do not want my other friends to know about it.     I am sorry that you, too, will think of me as a criminal and not as someone working hard to succeed in life.

I appreciate the courtesy that you and the probation officers have shown my family and me during this time. Quite frankly, my parents are totally mortified by my situation and I promise that if you put me on probation I will be a model probationer and do everything in my power to be a model citizen as well. I hope that you will understand the jeopardy that my job will be in if the probation office has to inform KPMG and hope you can do something about that.

I hope that we meet again in other circumstances and that when I do, you will be proud of what I have accomplished.

Sincerely,

Joseph A. Covelli

# GOAL STATEMENTS – FY08
## AUDIT ASSOCIATE

*As of 3/4/2008*

### PROFESSIONALISM & INTEGRITY
### "DOING THE RIGHT THING IN THE RIGHT WAY"

Doing the right thing in the right way means we always act with honesty, integrity, and professionalism, make the right judgments, comply with the KPMG Code of Conduct, and adhere to our values-based compliance culture. We have built a culture where everyone is encouraged to identify issues and behaviors inconsistent with our values and professional responsibilities, and that once raised, issues are constructively reviewed and resolved. And those who express concerns are recognized and rewarded.

It defines the way we work with clients, engage our colleagues, and interact with our regulators:

- With clients, we resolve issues in a timely manner by communicating effectively and acting with professionalism.
- We respect, communicate, and collaborate with each other and our colleagues.
- We act with transparency, and our interactions with regulators enable us to build trust and mutual respect.

### Audit Quality
*Building a foundation of critical thought and technical skills in the areas of accounting and audit. This includes proactively questioning to ensure thorough understanding, and exercising an appropriate level of professional skepticism.*

Deliver and maintain a high level of quality, client service and professionalism.

Develop and implement a plan to complete all CPA requirements, and obtain license within 18 months of being eligible to sit for the CPA exam.

Understand and comply with all applicable firm professional practice and risk management principles and policies, including the timely completion of all required firm training, and CPE requirements. Achieve 100% compliance with firm requirements (e.g., independence, Sentinel, KRisk, workpaper filing, time and expense reporting).

Enhance accounting knowledge and skills by reading DPP Bulletins, PPLs, and new accounting pronouncements applicable to engagements; developing and following a continuous program of independent reading and self-study; and understanding and leveraging accounting research tools. Complete one self-study outside of required training. Keep abreast of broader business issues and trends.

Demonstrate an understanding of auditing by proactively embracing, learning and applying Vector, CAATS, IDEA and MUS; taking ownership for effectively completing and documenting assigned engagement responsibilities; and exercising appropriate professional skepticism (e.g., follow up when facts appear incomplete, inconclusive or contradictory).

Proactively alert senior associate and request additional tasks when nearing completion of assigned duties.

Work towards reaching personal utilization goal of ___ hours.

### Client Care
*Resolving issues with great communications, timeliness and professionalism.*

Work with senior associate to fulfill day-to-day audit engagement activities, which include anticipating and resolving

1

# GOAL STATEMENTS – FY08
## AUDIT ASSOCIATE

*As of 3/4/2008*

| |
|---|
| issues, reporting status, and delivering highest quality results within time and budgetary constraints. |

| **Engagement Management** |
|---|
| ***Building effective project management skills.*** |

| |
|---|
| Meet due dates for work paper completion for senior associate, manager and partner review and signoff.  Maintain a vigilant focus on accuracy and perform self-reviews of all workpapers prior to completion. |
| Complete work assigned within established engagement budgets through effective planning and execution, without sacrificing audit quality. |
| Report anticipated overruns or out-of-scope work to the engagement senior associate. |

| **EMPLOYER OF CHOICE** |
|---|
| **"A GREAT PLACE TO BUILD A CAREER"** |
| **To be an Employer of Choice, we must ensure that we leverage skills in the right way, make career development a key priority, and improve work life balance. As a great place to build a career, our actions help ensure that all of our constituencies view us as the best of the Big Four firms: recruits want to join us; faculty direct their top students to us; our employees have access to great career opportunities; clients value our professionalism, knowledge, and the quality of our services; and our alumni are our ambassadors in the marketplace.** |

| **Career Development** |
|---|
| ***Building your skills, knowledge and career at KPMG.*** |

| |
|---|
| Leverage the Employee Career Architecture tool and proactively develop a multi-year career plan at KPMG (e.g., industry skills, client assignments, rotations). |
| Actively solicit feedback to improve performance and advance career objectives. |
| Complete performance management processes (goal setting, engagement reviews and interim/year end performance reviews) within firm deadlines, providing thorough and complete self assessments and engagement reviews. |
| Request challenging task assignments from engagement senior associate that require technical research, in order to create continuous learning. |

| **Leadership** |
|---|
| ***Assuming responsibility for personal leadership and the teams with which you are involved.*** |

| |
|---|
| Take responsibility for effectively managing client assignments, personal utilization and training requirements. |
| Participate in office and other networking activities (e.g., Involve, EOC efforts, diversity affinity groups, and community activities). |

2

# GOAL STATEMENTS – FY08
## AUDIT ASSOCIATE

*As of 3/4/2008*

| |
|---|
| Build and sustain effective relationships. Interact with others in a manner that demonstrates trust, fairness, respect and inclusiveness. |
| **Retention**<br>***Working together as a team. Encouraging a positive, rewarding, inclusive work environment where professionals feel great about their career opportunities.*** |
| Proactively seek out opportunities for team building within your office. |
| Recognize colleagues' efforts on a regular basis, both formally and informally. |
| Seek a mentoring relationship. |
| **Recruiting**<br>***Shaping perception on campus so that recruits and faculty see KPMG as the best of the Big Four. Building your relationship and communication skills.*** |
| Participate in at least one recruiting initiative, and stay in contact with strong potential candidates. |
| Participate in the Employee Referral Program, when possible. |
| **QUALITY GROWTH**<br>**"RIGHT CLIENTS, RIGHT SERVICES"**<br>**We are committed to serving the right clients, and offering them the right services. We will succeed by serving those clients whose values and ethics match our own, and who fall within our permission and scope.** |
| Increase understanding of clients' business and industry, broaden and deepen professional relationships with clients, and enhance client communications skills. |
| Participate in networking activities and join external professional organizations, and/or community or charitable organizations. |
| **GLOBAL STRENGTH AND CONSISTENCY**<br>**"THINK GLOBAL, ACT GLOBAL"**<br>**We will incorporate global behavior as a key part of our culture and make global consistency a "trademark" of the firm. We will focus on emerging markets and leverage the knowledge, experience, and strength of our global network of member firms to ensure we continue to deliver consistent, quality services to our clients, regardless of their geographical location. We will provide opportunities for our people to enhance their careers through international training and experiences.** |
| Identify developmental opportunities to improve cross-cultural awareness. Increase global knowledge and experience. |
| Consider future participation in a rotation in a domestic or international office. |

3

EXHIBIT B

February 29, 2008

The Honorable Royce C. Lamberth
United States District Court for the
 District of Columbia
3rd and Constitution Avenue, NW
Washington, DC 20001

      Re:    Joseph Covelli

Dear Judge Lamberth:

      I am writing to share my perspective of why my young friend, Joe Covelli, is in your courtroom – a place where he should not be – and to ask you to do all in your power to get him on the right path so that he has the chance to use his enormous potential.

      By way of background, I am 32 years old and have worked on Capitol Hill for eight years. I have known Joe Covelli since either the spring of 2004 or the fall of 2005. I met him while he was still in college and I was serving as the alumni advisor to his fraternity at George Washington University. While my job is press secretary to Senator Jay Rockefeller of West Virginia, since 2003 I have served as a volunteer alumni advisor to Pi Kappa Alpha fraternity, first at American University and, since 2004, to the chapter at George Washington University which was established that year as a new organization on the GW campus. In that capacity, I attend the weekly meetings of the fraternity on Sunday night, I meet as necessary with the officers, and am available to the individual members to provide advice and counsel on a wide range of personal, operations and fraternity problems. I also see the members at social events. As a result, I got to know most of the members quite well and was in a position to know when they were acting in or out of character. Since Joe left college and his graduate studies, we have kept in touch. I generally spoke to him about once or twice a month but our contact has not been as frequent recently – perhaps because of the pressure he has been under with his case.

      At the time that Joe Covelli joined the fraternity, it had about seventy to eighty members. I got to know most of the members beginning in their freshman year. Because the fraternity was newly established at George Washington in 2003, I first met Joe when he was a sophomore.

During his junior year, Joe was elected by the membership as the treasurer of the fraternity. This was an honor for him and, for the first time, the fraternity had a treasurer who had some financial savvy. For a young man, this was a significant responsibility. The fraternity had an annual budget of about $30,000 to $35,000. Joe was responsible for collecting dues and keeping the fraternity's accounts in order. He would collect the dues in cash, checks or from online payments and make deposits to the fraternity's account at Commerce Bank. He was responsible for paying the bills. He had to keep the accounts straight and reimburse members who had spent money for fraternity projects. He achieved about a 90% collection rate which was an unbelievably good result. He also managed to grow the fraternity's money using his financial sense by doing such things as purchasing certificates of deposit in order to increase the interest paid on the fraternity's deposits and avoid the necessity of raising the dues. The fraternity's alumni audited the accounts of the fraternity annually to keep some measure of control.

Joe impressed me as a bright – even brilliant – young man who had no time to spend with people who were stupid. He kept to a core group of friends within the fraternity. At the time, I thought of him as a "conditional adult." He had assumed a tremendous amount of responsibility that included not only his studies but his job at Commerce Bank that took a tremendous amount of his time. He liked being recognized for how well he was dealing with it. When he made a mistake, he would be contrite and understood why people were mad at him.

Joe was always afraid of disappointing his father who set high standards for him. He had the privilege of having a car during college and was very afraid that after he got a speeding ticket that the car would be taken away from him.

At some point during his college career his friends became concerned with Joe's gambling. He started by doing online poker games and would take the money he won that way and go to Atlantic City. Joe would get attention by arranging trips to Atlantic City for his friends and he seemed to be trying to impress people. At the same time he was getting more and more responsibility at Commerce Bank and was being asked to spend a lot of time on weekends helping to open new branches as well as managing the branch where he worked. His friends did not know how much he was winning or losing with the gambling but it did not seem to have a debilitating impact on him because he kept up with his studies as well as his job. I thought at the time that it was odd that he was getting so much responsibility as a comparatively young man and that perhaps he was getting too much responsibility in light of all of his obligations. I also remember when his girlfriend broke up with him in the middle of his junior year which really threw him for a loop. However, none of these outside pressures affected Joe's careful stewardship of the fraternity's money. His attitude was that he was keeping the money that belonged to his friends and he wanted to do the best, most responsible thing with it. He was good at growing the money.

Joe was the type of person who would drop everything to help someone else. If someone needed a ride late at night, Joe would not hesitate to go somewhere and pick that person up. Ironically, now when he could use the support of his friends, Joe has chosen to keep his current situation quiet. Only a few close friends, including me, know about it. If others did know, I am quite confident that they would step up to help Joe.

I cannot remember exactly when I learned of the trouble Joe got into but I believe it was when I asked him about opening an account at Commerce Bank and he told me he no longer worked there and explained why. He told me that on one of his trips to gamble that he had arranged with one of his bank colleagues to go into the bank's computer system to arrange a temporary credit increase and then made a fake deposit to cover some losses which he paid back almost immediately but the bank found out about it. He told me about the FBI agents coming to his dorm room and questioning him. He told me he had explained everything to them and was really angry at himself for doing something so stupid. I understand he pled guilty to a felony involving computer crime.

That is my judgment of the situation precisely. Joe was young and made a really stupid mistake that, had he been a few years older with more experience under his belt, he would never have done. Since this incident happened, I have watched Joe go from being a happy go lucky college student to a grown up. He is not as judgmental about other people; he no longer sees situations as black and white. He has had the fear of God put in him. He understands that it is not enough to know right from wrong but also why he has to avoid doing something that is wrong.

Both in my own college days and certainly since becoming an advisor to the fraternity, I have come to understand that there is a price to be paid for growing up and coming to understand the need to act responsibly. Some get pulled over for drunk driving; some get fired from a job, and others have some tragic personal event that pulls them back from an episode of misbehavior. In my view, Joe was bright, brilliant, and needed a little focus and perhaps someone to point him in the right direction. He is very capable of figuring out why not to do something as reckless as he did again. He was a kid who made a big, BIG mistake. Just by going through the process of being horrified at what he had done, being interviewed by federal agents who showed up at his dorm room in front of a friend, by having to confess to his parents and pay a lawyer, he's learned his lesson.

Almost unbelievably, Joe had a bright career ahead of him. He is in almost the perfect job for him in light of this experience. He works as a junior auditor of banks. His job is to count the money and look at the internal controls. He's so smart that he can figure out not only where the money belongs but also what additional controls are needed to secure the bank's funds. As I understand it, he acts more as an investigator and adviser under the supervision of more senior auditors and has no personal responsibility for the clients' funds or the firm's funds.

Unfortunately, because of his youthful mistake in judgment, he will probably never be able to get a security clearance and may be in jeopardy of losing his job if the firm finds out about his criminal conviction. I think they would be making a terrible mistake. Joe just needs a chance to redeem himself and show people he can do it. He is not going to make such a mistake again, I am confident.

Indeed, if I had a chance, I would hire him in a heartbeat. In my previous positions, I have managed a budget of over $1 million. Joe Covelli is one of the smartest guys I know when it comes to money. He knows how to protect, audit and grow money. He can make $1 grow into $10. Joe even signed up his younger brother for a credit card account so that he would be

able to get credit later on by demonstrating that he could handle it responsibly.  I do not know of anyone who would have thought so creatively about such things.  He told his brother it would be useful in case something happened to their mother and father.  I would not worry about Joe Covelli misspending anyone's money.  If he did (which he would not), he would pay it back immediately.  I believe him to be forthright and honest.  I think it was significant that he never ducked or evaded responsibility or tried to mislead anybody about what he did.  I think his forthrightness is representative of his character and that someone who was older would have known better.

I think the question you have to ask yourself is whether he has learned his lesson as a result of what he has been through or whether he has to be reminded again and again of this humiliation and to be punished again by losing another job.  I offer you my judgment that I do not believe that there is a risk that he will do something again to put other people's money at risk or his own career at risk.  I trust him – and I do not trust very many people whom I know (that's a personal predilection on my part).  I consider Joe Covelli to be a good friend and I do not have a lot of them (as opposed to acquaintances).  I believe he has learned his lesson and has suffered from being a disappointment to the people who believed in him.  My only disappointment is that Joe will not trust more people to understand his mistake and ease the pain he has been in.  He has learned the hard way how the world really works.

I would appreciate it and hope that you give Joe a chance to demonstrate that he has learned his lesson and to make sure, if possible, that he has every opportunity to keep his job and continue earning his way out of the debt he has accumulated from his mistake.  He was naive when he made his giant error in judgment.  The adult Joe Covelli is going to be a better, more knowledgeable and compassionate person as a result of this experience.  I am confident that if you trust him to do the right thing, your trust will not be misplaced.

Please do not hesitate to call upon me if I can be of any assistance to Joe.

Sincerely,

Steven Broderick

EXHIBIT C

# Our Lady of Mt. Carmel Old Catholic Church

The Anacletian Brothers and Sisters

227 Tennessee Ave., NE, Washington, DC 20002
~~Office: (202) 592-0244~~
Fax: (202) 330-5198

Archbishop Michael V. Seneco, SPSA, Rector
Email: rector@olmc-dc.org
Website: www.olmc-dc.org

Mass is offered each Sunday at
The Chapel in Historic Congressional Cemetery
1801 E. Street, Se
Washington, DC 20003

February 27, 2008

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
3rd and Constitution Avenue, NW
Washington, DC 20001

**Regarding Joseph Covelli**

Dear Judge Lamberth:

I am writing you to tell you of my experience with Joseph Covelli, who did volunteer work for me throughout his senior year at George Washington University and during his year of post-graduate studies.

I am very sad to learn that he is before you for sentencing for a computer crime. As I understand it, he used the computer at the bank where he worked to make himself an unauthorized short term loan to cover a gambling debt and repaid the "loan" almost immediately. Based upon my knowledge of this young man, I view this as the kind of error in judgment that someone who has not yet matured might commit and know that he will learn from this bad experience not to do anything like this again.

I met Joe Covelli through Commerce Bank. Joe volunteered for me regularly from 2005 through 2007 and averaged 26 hours per month in my office. During the two years that he volunteered for me, he performed many office-related duties. He was always willing and capable to perform any task that was asked of him.

During the time he volunteered for me, I came to know Joe to be a man who is responsible, smart, willing, capable and reliable. Despite his unfortunate lapse of conduct that violated the law, I would welcome him back to DC and to the work we do without hesitation.

In my work as the Rector of this Church, I hear many confessions and work with DC prisoners as a chaplain for the DC Department of Corrections. In my opinion, the conduct for which Joe Covelli is in your court is out of character for him and will not be repeated. I think he has learned one of life's harsher lessons. In fact, since he is only 22, this experience may help him in later life to exercise the best judgment of which I know he is capable rather than giving in to momentary temptation.

If I can be of assistance or clarification on this letter, please do not hesitate to contact me.

Sincerely,

The Most Reverend Michael V. Seneco, SPSA, DD, L.Th.
Rector

*Note the new office number (240) 404-7720*